**N. S. CHAPMAN, d/b/a Chapman Dairy, Appellant,**

v.

**The FIRST–WICHITA NATIONAL BANK OF WICHITA FALLS et al., Appellees.**

**No. 16625.**

Court of Civil Appeals of Texas.

Fort Worth.

June 18, 1965.

Rehearing Denied July 23, 1965.

Humphrey, Gibson & Darden, and Lee Humphrey, Wichita Falls, for appellant.

Guy Rogers, Nelson, Montgomery & Robertson, and Allan D. Montgomery, Wichita Falls, for First-Wichita Natl. Bank of Wichita Falls.

Bagby & Ross, and Wm. L. Bagby, Arlington, for North Texas Producers Assn.

Eggers, Sherrill & Pace, William F. Smith and J. N. Sherrill, Jr., Wichita Falls, for Sam Gose.

MASSEY, Chief Justice.

On or about June 8, 1961, N. S. Chapman, finding himself in financial straits, entered into a contract with the First-Wichita National Bank of Wichita Falls. The objective thereof was to attempt an amicable solution of Chapman's financial difficulties with an amount recouped by the bank which it would be willing to receive in discharge of Chapman's obligations.

Not a matter of dispute is the fact that the bank did, thereafter on August 17, 1961, take a judgment in the sum of $203,698.43 against Chapman. Thereby was settled the amount which, but for the afore-

said contract, would be owing by Chapman to the bank for the principal amount owing, plus interest and attorney's fees.

By the June 8, 1961 agreement Chapman and the bank agreed that: "a prospective purchaser is willing to purchase the Chapman Dairy and its properties for a price of approximately One Hundred Seventy-nine Thousand and No/100 Dollars ($179,000.00) upon the condition that: 1. A disinterested Receiver is appointed to take over the operation of the Chapman Dairy Plant with directions to consummate the sale thereof; and 2. That a Federal Government milk supply contract heretofore bid by Chapman in the approximate amount of One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00) is accepted and approved by the Government and can be sold, together with the Chapman Dairy, its properties and facilities." By recitations thereafter appearing in the instrument Chapman agreed to the appointment of a Receiver for such purpose in consideration of the bank's agreement to use its efforts to obtain an acceptance and approval of the Government to the transfer of the milk supply contract.

It was further agreed that "Upon consummation of the sale of said contract and the Chapman Dairy Plant, its equipment and facilities, and the payment of the proceeds thereof, less expenses of the Receivership by the Receiver to the bank" the bank would cancel all indebtedness owing by Chapman, release all liens securing the same, and return to Chapman certain pledged bank stock and insurance policies representing security (along with the liens) for Chapman's indebtedness.

At time the aforementioned judgment was taken the bank delivered to Chapman a letter in which the parties' agreement was either clarified or confirmed, in that it recited that *if the proceeds of the sale* (of the Chapman Dairy Plant, its equipment and facilities) *were sufficient to retire Chapman's obligations under the contractual agreement* the bank would look only to the proceeds of the sale of the "mortgaged properties" and would pay the receivership costs and attorney's fees. It would not be unreasonable to view the letter as stating a reduction of the bank's rights as reflected in the original agreement.

Since the agreement(s) of the parties contemplated the sale of the Chapman Dairy as a "going business enterprise" we believe that a proper construction would be that it was intended thereby that the existing debts of Chapman accrued pursuant to the operation of his business would be payable—and chargeable to the "Chapman Dairy", considered as an entity. Whether payment thereof be made before or after the sale would be immaterial. If made after sale the meaning of the agreement would be that sufficient proceeds from the total realized upon sale would be used to retire the indebtedness, so that the "Chapman Dairy" would be "out of debt".

Another matter of construction would be the meaning and intent of the contract wherein it was provided that the proceeds of the sale (as a debt-free business) would be accepted by the bank (if it was sufficient "to retire Chapman's obligations under the contractual agreement") looking only to the proceeds of the sale of the "mortgaged properties". It would appear that the most favorable construction to Chapman would be that the parties intended that the bank agree to forgive and forget the fact of the judgment it took against Chapman, and the amount thereof,—and instead of seeking to enforce the judgment—accept in satisfaction of Chapman's indebtedness the amount theretofore owed, conditioned upon the sufficiency of the proceeds realized from the sale of the "Chapman Dairy". Correlatively, in the event the proceeds were in excess thereof the bank would receive only the aforesaid amount, with Chapman to receive the balance (i.e., the difference between the sale figure and indebtedness figure). Furthermore, and in the event the bank should receive the amount of indebtedness as so computed it would be obliged

to pay the receivership costs and attorney's fees.

According to our calculations (from the figures in the bank's pleadings under which it took its judgment for $203,698.43) Chapman's indebtedness (as of the date the judgment was taken) was a little more than $183,408.10. The proceeds realized from the sale of the Chapman Dairy Plant for $179,364.25 (a figure which all parties agree we may use) were less than the indebtedness which the bank required in order to make itself whole—calculated only upon the amount of principal and interest owed on August 17, 1961. It therefore appears that the letter agreement (delivered to Chapman at the time the bank took its judgment) never became binding because the condition or contingency upon which the bank's promise depended did not occur. Nevertheless, as hereinafter noted, the trial court treated the agreement as binding upon the bank and sought to apply it in the apportionment on accounting, in charging the bank with expenses of receivership and costs, etc. Of this the bank does not complain nor seek any curative action in this court. We are of the opinion that it reasonably could have—as a condition precedent to its compliance with the promise made in the aforementioned letter—insisted that it be supplied not only with the proceeds of the sale, but with the additional amount of $4,043.85 ($183,408.10 minus $179,364.25).

We revert to the occurrences in June, 1961. On June 5, obviously pursuant to agreement of all parties, the bank filed in the District Court of Wichita County, Texas, an Application for Appointment of Receiver. Chapman signed and filed a waiver of service and consented to such appointment. In the bank's application no mention was made of the contractual agreement of June 8. However, the Order Appointing Receiver (following hearing before the court on June 8) reflected the presence of Chapman at the hearing. In the order appears the appointment of Sam Gose, as Receiver "of all the assets of Chapman Dairy that are described in and secured by instruments introduced in evidence and fully set out in Plaintiff's original Petition, taking possession of such property and operating it to the best advantage possible, * * * buying and selling dairy products, maintaining a fleet of trucks and delivering dairy products * * * to carry on such business with as little change as is possible so that such concern will continue as a going business and be available for sale as such rather than to be closed down and sold as a defunct business * * *." The order authorized and directed the Receiver to use all available means to retrieve a government contract of Chapman which he had lost because of financial inability to carry out its provisions. The court's language further provided that the Receiver was "authorized and directed to take any steps, sign any contract, execute any instrument and/or do any act whatsoever that will obtain such contract so that it, with the plant, can be sold together to any purchaser who would be willing to acquire the mortgaged property only in the event he could acquire the right to fulfill such contract with the government."

The receiver took possession of the Chapman Dairy and all its property, mortgaged or not, and operated it until a sale was effected to North Texas Producers Association. A delivery of all the property was made. As applied to the mortgaged property, at least such occurred pursuant to an application of sale and authorization thereof. On November 10, 1961, the Receiver filed a final report. In the interim period Chapman wholly freed the Receiver's hands. During the period in which the Receiver conducted the operation of the dairy it appeared that all interested persons were in complete accord.

It is to be observed that no record is brought forward of the evidence introduced at the hearing of June 8, 1961. It is neither proved nor disproved that evidence introduced upon the occasion included the written contractual agreement of the same date between Chapman and the bank.

Therein it was agreed that the Receiver would be authorized to sell the dairy and all its property and facilities (inferentially, whether or not items thereof be mortgaged or pledged). We have no doubt, however, that the contract was either presented to the court, or that the evidence demonstrated to the court that the parties were willing to enter into such agreement. If so, it therefore constituted part of the evidence before the court upon which it entered the order appointing the Receiver. See 49 Tex.Jur. 2d 123, "Receivers", § 94, "Continuance of business".

December 8, 1961, appears to be the first occasion that Chapman found fault with anything done or desired to be done in connection with the entire transaction. He advanced the contention that he should not be charged with any of the expenses of the Receivership. Among such he includes the loss sustained by the "Chapman Dairy" while it was operated by Receiver Gose. He advanced the further contention that such of his property as was not covered by instruments of lien or pledge should not have been treated as property administered by the Receiver as "in Receivership". He claimed that these properties, which he had "tacitly agreed" that the Receiver use in the operation of the dairy business (in order that interruption in operation might be avoided) should have been returned to him within a reasonable time after the sale of the mortgaged property. Actually, it seems to be conceded by Chapman that the properties should not be returned to him.

From December 8, 1961 Chapman elected to proceed on the theory that his property which was neither mortgaged nor pledged was converted by the Receiver and/or North Texas Producers Association. His theory of recovery is that such parties should be adjudged liable to him for the value of his property, considered as "converted". He made an exhibit a part of his pleadings. He itemized such property with the values he attributed thereto. For example: Chapman listed seventeen motor vehicles on which there was no record of lien; an inventory summary of milk and ice cream supplies with cans, cases and racks; "accounts receivable" as of June 8, 1961; an inventory of office and garage equipment at the dairy plant; and thirty-one ice cream cabinets, with three can milk dispensers (being cabinets and dispensers purchased subsequent to date of the mortgage). The total claimed on the property itemization was $94,709.03.

All parties were joined upon issues made by pleadings. Following a hearing before the court, judgment was rendered with an order incorporated in discharge of the Receiver. Pursuant thereto Chapman received approximately 100 ice cream cabinets which the evidence reflects were in various places, mostly in the State of Oklahoma (possession of which was never acquired by either the Receiver or by North Texas Producers Association) and a net amount in money of $5,120.08. In that connection we should state that North Texas Producers Association held a judgment against Chapman which had been secured in proceedings extraneous to those under scrutiny, and the amount thereof was included as a part of the accounting considered by the court in arriving at the net amount to which Chapman was found entitled. The judgment was in the amount of $10,573.59, and Chapman does not contend that there was any error on the part of the court in treating and considering it in the accounting. When said amount is added to the $5,120.08, the "net" in money to be realized by Chapman (as applied to the instant proceeding) was the sum of $15,693.67.

Therefore Chapman received $15,693.67 in cash; restoration of his bank stock and life insurance policies; and a "clear title" to the ice cream boxes. The "net" price received by the Receiver for the mortgaged properties of Chapman, sold and delivered to North Texas Producers Association (with the aforementioned ice cream cabinets considered as included) was $179,364.-

25. This the bank is agreeable to accepting pursuant to the court's interpretation of the contractual agreements of Chapman and the bank.

We believe that our problems are simplified by first passing upon the provisions of the contractual agreement(s) relative to the obligation of Chapman. It appears from the face thereof, without necessity to resort to extrinsic evidence, that Chapman agreed that the Receiver would take charge of the Chapman Dairy as a going, active and operating enterprise, including the plant, equipment and facilities, and also including the operating cash (petty cash) on hand and the accounts receivable, all as might be suspectible to inventory at the time the Receiver went into possession. Further, that if and in the event the contemplated sale should materialize the Receiver (whether in his capacity as such, or otherwise) should transfer to the purchaser all Chapman Dairy property suspectible to inventory at time of the delivery. Of course, such property as contemplated by the contract which the Receiver (excusably) could not and did not reduce to possession would, of necessity, be excluded from property the Receiver would seize and administer. As circumstances developed such was part of the property under mortgage, and therefore become matter to be considered in connection with the accounting of what was owed by Chapman to the bank—in that the value which would have been therefor received, pursuant to the sale to North Texas Producers Association, would be an obligation subsisting even after sale, for the proper sale price would be thereby reduced.

In the instant case this meant that it was not $179,364.25 which North Texas Producers Association paid, but a smaller amount arrived at by deducting from such figure the value of the property not reduced to possession—and not delivered—as agreed upon between such purchaser and the Receiver. Said amount would likewise become (or remain) owing by Chapman to the bank—for the bank could not obtain reimbursement therefor from the Receiver. If said amount be paid by Chapman (whether in cash or by way of credit on the accounting) the situation would be the same as would have been the case had North Texas Producers Association received and paid for the property, with this difference: Chapman would receive back the title to his own property, now freed of any lien. The property consisted in approximately 100 ice cream boxes previously mentioned. They were to be found in various locations, principally in the State of Oklahoma. The court approved the amount of $5,000.00 as proper to be used for the value thereof. We may treat the situation as though the court decided, for purposes of the receivership, that the average value of each ice cream box was $50.00. There was adequate evidence placed before the court which excused and justified the Receiver's failure to reduce the ice cream boxes to possession.

■ There were some ice cream boxes, which may have been in part among those in Oklahoma and in part among those taken into possession by North Texas Producers Association (pursuant to the sale effected by the Receiver), acquired by Chapman subsequent to the date he executed the mortgage the bank contended had the effect of applying to all such cabinets. Chapman claims that these and certain milk dispenser equipment should not have been considered as included in the property sold by the Receiver. He contends that the mortgage did not cover such. We hold that they were covered by the mortgage and thereby encumbered from the time they were acquired. That they so became could be a matter of contract between the parties, i. e., the bank and Chapman, under the law of this State. In the portion of the mortgage describing the property of Chapman which he agreed should be covered thereby appeared the following language: "together with all of the interest of Grantor (Chapman) in and to such realty as well as all fixtures and personal property located upon such land or later placed thereon, or used or obtained in connection therewith,

together with all other interest in and to the above described real and personal properties which the Grantor may now own or may later acquire, all of which property is collectively referred to herein as the 'mortgaged property'". The premises contemplated by this language was the "Chapman Dairy".

■ We refer again to the letter the bank gave Chapman when it took judgment on August 17, 1961. Therein the bank agreed that if the proceeds of the sale met a certain test it would pay the expenses of the Receivership. Although the test was not met the trial court proceeded to treat the condition of affairs following the sale by the Receiver as though they were, and of this the bank did not complain. We will treat it likewise. With this done it is obvious that the bank agreed that it, and not Chapman, would pay the expenses of Receivership. There is no doubt but that the Receiver's fee allowed Gose and the reasonable fees allowed the Receiver's attorney and accountant, etc., would properly be treated as expenses of Receivership. These amounted to $9,730.96. These the bank did pay—or was treated as having paid in the judgment from which the appeal was taken. However, during the few months between the time the Receiver took charge of the Chapman Dairy Plant and the time it was turned over to North Texas Producers Association, as the purchaser from the Receiver, an operating "loss" of approximately $20,000.00 was sustained. Chapman's contention is that this "loss" should be treated as part of the expenses of Receivership covered by the bank's letter and the court erred in failing and refusing to so treat it. Chapman contends that he should have credit therefor through charging the "loss" against the bank. In other words Chapman's theory is that the sale of the mortgaged property—as part of the overall sale of the Chapman Dairy—would have been worth $20,000.00 more if there had been neither a "profit" nor a "loss" from the Receiver's operation of the dairy during Receivership, whereby he would be prejudiced unless the bank paid the $20,000.00 as expenses of Receivership.

While not established in the evidence it is to be presumed that the Chapman Dairy was losing money even before there was a Receivership. Evidence in the record, even from Chapman, shows that unless the business was continued, so that the Receiver could sell it as a "going enterprise", the property—mortgaged or not—would be "practically worthless". The term last used is a figure of speech, certainly connoting the parties' mutual understanding that by any other character of sale the proceeds to be realized would be less than two-thirds (⅔) the proceeds hoped to be realized in following the agreed method. There was therefore good reason why the Receiver should continue to operate the business, especially with the agreement of all parties though his conduct thereof involved an operating loss. See 75 C.J.S. Receivers § 184, Business Conducted at Loss, p. 831.

In the windup of the affairs of the Receivership the court was administering equity. The term "expenses of Receivership" has a meaning which might vary from one situation to another. In our opinion operating loss experienced by continued operation of Chapman's business did not constitute "expenses of Receivership". It was within the sound discretion of the trial court to treat the operating "loss" as other than such expenses; also to charge such against the mortgaged property. 75 C.J.S. Receivers, § 266,—Receivership Expenses, p. 894, and § 301, For Receivership Expenses, and subsequent sections under subtitle, C. Parties, Property, and Funds Liable, p. 977, et seq.

From what has been written, hereinabove, we have now disposed of Chapman's complaints as against the bank. The bank is making no complaint as against Chapman. We next direct our attention to Chapman's complaint as against Sam Gose, individually, and as the Receiver.

We believe it obvious from the record that Gose was to serve in a dual capacity; as Receiver in so far as the interest of the bank was concerned, in the operation of the Chapman Dairy during the Receivership, and as applied to the property mortgaged to the bank as security;— and as Chapman's agent in connection with the disposition of the Chapman Dairy property not mortgaged. As Chapman's agent Gose was not to be separately compensated, but it was understood that his sole compensation would be a "receiver's fee". As "agent", however, Gose was authorized to sell such of Chapman's property as had the character of "Chapman Dairy property". At page 194 of the statement of facts Chapman testified that what he expected to receive "at the end of the line, after the sale was effected" was payment for his property. Thereby he meant that he expected payment for such of his property as might be disposed of by Gose, as his agent for the purpose.

It thus becomes important to consider Chapman's pleadings from the standpoint of his cause of action against his agent for the latter's malfeasance or misfeasance. From our examination the only allegation which appears to charge Gose, as agent, with anything done or failed to be done is (1) failure to make an accounting for the property administered and/or sold by him, and (2) that Gose, as agent, or both Gose and North Texas, converted the property of a value in excess of the sum of $94,709.03, to Chapman's detriment.

The evidence established that an accounting was made by Gose, in so far as the whole of the accounting might be said to relate to and include the property administered and/or sold by him as an agent for Chapman. The evidence established that Gose did not convert any of Chapman's property or any proceeds thereof. The property of the "Chapman Dairy"—not covered by mortgage—was converted by North Texas, if converted in fact. Of this aspect of the case treatment is given at another point of the opinion.

No citation of authority is necessary to substantiate the law to the effect that the burden of pleading and proof is upon the complainant if he seeks to establish a cause of action as a principal against his agent because of the agent's breach of duty owed under the relationship. In neither respect may it be said that Chapman has discharged such burden in this case. Considered as an agent, Gose was properly acquitted of any liability to Chapman, as a principal.

Chapman also complains of Gose as the Receiver. In respect thereto one item of complaint relates to the fact that the Receiver paid debts of Chapman, owing prior to the Receivership, of approximately $8,526.07. The evidence establishes that the debts were of "the Chapman Dairy", which all agreed must be continued as an operating business so that it might be sold as such. Such objective would have been hampered, indeed might even have been inhibited, had the Receiver refused to pay these debts. Furthermore, reference is here made to the benefits which accrued to Chapman as well as the bank in the enhancement of the price realized for the Chapman Dairy and to the fact that through its attainment Chapman was enabled to obtain life insurance policies and bank stock which the bank might have levied upon to make itself whole. Indeed, Chapman was exposed to liability in the amount of the $203,698.43 judgment of August 17, 1961.

What is said in the foregoing paragraph also has application to $4,505.76 in outstanding checks which "Chapman Dairy" had issued pursuant to business operations without funds on deposit to cover. The Receiver made a deposit to cover the checks with the objective of preserving the Chapman Dairy as a going business enterprise so that it would have a greater value at the time it should be sold. Chapman's complaint that said amount constituted no proper part of property included in the Receiver's accounting is without merit.

Consideration given what we have stated in the two preceding paragraphs the two item groups therein considered constituted a part of a total of $30,033.73 which Chapman contends the Receiver was obliged to account for, but did not. Thus is clarified the Receiver's accounting for the $30,033.-73. We find that Chapman is in error in his contention that the Receiver failed to make an accounting therefor. The Receiver's accounting included such, and the court approved the entire accounting. There was no abuse of discretion by the trial court in its approval.

From what has been written, hereinabove, we have now disposed of Chapman's complaints as against Sam Gose, individually as Chapman's agent, and as the Receiver for the Chapman Dairy. We next direct our attention to Chapman's complaint as against North Texas Producers Association.

One point of Chapman's complaint against North Texas relates to the 100 ice cream cabinets heretofore discussed in the portion of this opinion relating to his complaint against the bank. We are reminded that these cabinets were included in the bank's mortgage and that the Receiver was directed to reduce them to possession for ultimate sale as included in the mortgaged property of the "Chapman Dairy". They were not reduced to possession by the Receiver, and his explanation thereof was satisfactory. He did purport to deliver title to North Texas Producers Association, but North Texas could not obtain possession. It became a matter of accounting because of the inability of the Receiver to transfer both title and possession. This matter of accounting was settled by cancelling out the purported transfer to North Texas Producers Association of any interest in the cabinets under an agreement that the total value thereof (intended to be used in the Receiver's sale to North Texas) was $5,000.00. Hence, instead of the Receiver having $5,000.00 to deliver to either the bank or to Chapman it was decided by the court that Chapman should have the title thereto (or the title, which was already Chapman's, should remain with him), with the accounting to show an obligation of Chapman of $5,000.00 because of the circumstances.

Chapman's point of error complains that the court erred when it charged him "for the benefit of North Texas Producers Association" with the $5,000.00. Viewed from one of several possible standpoints it would be proper to say that the court so charged Chapman. On the other hand it would be correct to say that Chapman had property of the value of $5,000.00 which was covered by a lien to the bank, but which lien the bank released so that Chapman had the same property free and clear of any lien. It has already been observed that the bank will not be made whole under the disposition adopted by the court. Even with an extra $5,000.00 the bank would barely be made whole in respect to the principal and interest owed by Chapman. We fail to see error. If any existed there would be no prejudice to Chapman.

Chapman has another point of error complaining of North Texas Producers Association. Such is in respect to the trial court having failed to require it to account to Chapman for the value of properties (of Chapman) transferred to it by Sam Gose, acting in what we have held to be an agent's capacity.

North Texas owed no one an obligation to render an accounting. At least it did not owe such an obligation to Chapman. The only theory of recovery by Chapman as against North Texas Producers Association is upon the premise that it converted his property. Because of the conversion Chapman seeks to recover of it the reasonable value thereof. The record clarifies the identity of the property in question, and it was shown that Chapman was acquainted with its condition at the time North Texas received it. We have already mentioned

that Gose, as Chapman's agent, was properly acquitted of any participation with North Texas in a conversion of the property. Under the theory of the court such property was indeed converted by North Texas Producers Association. The court decided upon the value thereof and, in effect, gave Chapman a judgment therefor. The court included such in the accounting independently made by it in the judgment. Thereby it factually found which of the parties owed which of the other parties, how much each owed and to whom. If the court was correct in the accounting, and we hold that in so far as Chapman's interests were concerned the accounting was more than fair in its decision relative to what belonged to him over and above what was covered by the bank mortgage—constituting the property the court chose to treat as "converted",— we proceed to examine the record and the judgment with the specific question in mind: "How much did North Texas Producers Association owe Chapman for the unencumbered property of Chapman which it converted?"

■ If a man bring suit against another on the theory of conversion for the value of property converted, he must shoulder the burden of proving "value". Here Chapman, as such a plaintiff, alleged the value to be more than double the amount the court awarded him. All the plaintiff's testimony concerning value was opinion testimony of Chapman, himself, and he was furthermore an interested party. There was evidence which supported the court's finding when it acted as the finder of fact in the premises. Chapman's value testimony provided a "ceiling" for which he might have obtained a judgment. There would be no "floor". Perhaps it might be contended that the court's finding of value, and its judgment awarding such, was against the great weight of the evidence. Chapman has no point of error presenting that contention and we therefore have not applied tests appropriate to such a question.

We have examined the whole record in light of each point of error presented and have decided that each must be overruled as either wholly lacking in merit, or as failing to present reversible error.

Judgment is affirmed.